# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MILO LORENZO FITZPATRICK,

> Petitioner,

v.                                              Case No. 05-CV-70107

PAUL H. RENICO,

> Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Milo Lorenzo Fitzpatrick, presently incarcerated at the Standish
Maximum Correctional Facility in Standish, Michigan, seeks the issuance of a writ of
habeas corpus pursuant to 28 U.S.C. § 2254.  In his *pro se* application, Petitioner
challenges his convictions of three counts of assault with intent to commit murder[1] and
three counts of felony-firearm.[2]  Because the court finds that Petitioner's claims are
without merit, the court will deny the petition.

## I.  BACKGROUND

Petitioner's convictions arise as a result of a shooting that occurred in Battle
Creek, Michigan, on the night of September 24, 2000.  Three police officers were called
to investigate a complaint by homeowner, Paul Lopp, who heard gunshots and called
911.  While on the phone with the 911 operator, Lopp looked out the window and saw
two men running toward his neighbor's backyard, heading into a van.

---

[1]Mich. Comp. Laws § 750.83.

[2]Mich. Comp. Laws § 750.227b(A).

Soon afterward, Lopp saw the lights from the police car.  He went to his front door and opened it.  He saw a police officer put his foot on the first step of his porch, and then "all of a sudden it was a gun war."  (Trial Tr. 116, May 18, 2001).  As he saw dust rising from the officer's radio, the officer fell to the ground.

Neither the officers nor Lopp was aware that, two blocks away from the Lopp home, a man by the name of Hubert Wilson ran a high-stakes illegal gambling operation in his garage.

On that particular night, Wilson testified that approximately twenty to thirty people were gambling in his garage.  One of the individuals, Kenneth Williams, stepped outside to relieve himself.  While there, Williams saw three men wearing masks approaching the house; at least two of which were in possession of firearms.  Williams panicked and ran back into the garage, crouching down behind the door.  As he did, one of the men discharged a shot through the door.

The armed men entered the garage and stole a large amount of cash from the gamblers that were present that evening.  At least one additional shot was fired during the course of the robbery.

Sergeants Brandon Hultink and Paul Madsen were on duty when Lopp's call came into 911.  Both responded to the call.  Officer Angel Rivera was on patrol and also responded, arriving at the Lopp home at the same time as Hultink and Madsen.  Officer Rivera parked his vehicle in front of Lopp's house, with the rear of the vehicle partially blocking the driveway of the neighboring home.  Officer Rivera had a video camera mounted to the dashboard of his patrol car, which was running during the time that he and the other officers approached the home.

2

As the officers approached the Lopp home, Sergeant Hultink noticed that there was a van parked in the driveway next to the home.  He looked into the van and saw that someone was in the van.  At that moment, a shot was fired from the van.  It shattered the center window of the van, and Hultink yelled to the other officers that he had been shot.

The officers, including Hultink, drew their weapons and fired into the van. Madsen was able to back away from the Lopp house and sought refuge behind Rivera's patrol car.  As he did, he noticed – and the video camera in the patrol car confirmed his observation – that bullets were striking the pavement tracking his movements.

Officer Rivera was able to move Hultink behind a minivan that was parked in Lopp's driveway.  While on the ground, Hultink was able to observe the van; he saw muzzle flashes coming from the center of the van and from the front passenger window.

During the gunfight, the driver of the van, the co-defendant in this case, Deshawn Witcher, started the engine, but did not move the vehicle.  Gunshots continued to erupt from the van, with Madsen, hiding behind Rivera's car.  Madsen continued to shoot into the van.  Witcher then backed the van directly toward Madsen, hitting Rivera's vehicle and striking Madsen.

The van then drove away.  The officers discovered the van, abandoned, about three blocks away from the scene of the shooting.  In the van, the police found the body of Ernest Brooks.  He was dead from an apparent gunshot wound to the back of the head.  Also found were two semi-automatic rifles and a semi-automatic handgun, a .9mm Ruger.  The two assault rifles were made by SKS.  The weapons were both of 7.62 by 39 millimeter caliber.  The firearms' expert, from the Michigan State Police

3

Crime Laboratory who testified at trial, concluded that multiple shots had been fired by the SKS rifle, and that the weapon caliber was the standard Russian-block military caliber for small arms.

Forensic examination of the van included the placement of dowel rods to trace the trajectory of the incoming bullets.  One of the bullets came through the front passenger door piercing both front bucket seats and ultimately entered the driver's (co-defendant Witcher's) right buttock, leaving a bloodstain on the front seat.  The stain was linked to Witcher by DNA testing.

In searching the van, the police officers found a Halloween devil mask, which was identified by the victims of the robbery as having been worn by one of the robbers, along with some cash.  The inner surface of the mask was tested for trace evidence, revealing Petitioner's DNA.  A bullet was found when Petitioner was eventually arrested. The bullet had Petitioner's blood on it; he had been shot in the foot by that bullet. Petitioner was arrested after he sought treatment at a nearby hospital, where the emergency room physician found three bullet wounds; two in his left leg and one in his foot.

A joint trial was held.  During trial, the jury was allowed a viewing of the suspect van, which was housed in the sheriff's garage in the basement of the courthouse. The jury found Petitioner guilty on all counts.

On July 9, 2001, the trial court sentenced Petitioner as a third-habitual offender to concurrent terms of life imprisonment on the first assault with intent to murder conviction, fifty to seventy-five years' imprisonment on the remaining two counts of assault with intent to commit murder convictions, to be served consecutively to

4

concurrent two years' imprisonment terms for the three felony-firearm convictions.

Petitioner's guidelines range under the Michigan Sentencing Guidelines was two

hundred seventy to five hundred sixty-two months, or about twenty-two to forty-six

years.

Petitioner's convictions and sentences were affirmed on appeal. *People v.*

*Fitzpatrick*, 2003 WL 21977224, No. 236187 (Mich. Ct. App. Aug. 19, 2003), *l'v denied*,

469 Mich. 1015, 676 N.W.2d 629 (2004). Petitioner now seeks the issuance of a writ of

habeas corpus on the following grounds:

> I.   Petitioner was deprived of his Fifth and Fourteenth
> Amendment rights of due process when his trial was
> consolidated with that of co-defendant Deshawn
> Witcher.
>
> II.  Petitioner was denied his Fifth and Fourteenth rights
> of due process and his Sixth Amendment right to a
> fair trial when the trial court admitted (1) evidence of
> petitioner's alleged participation in a prior robbery, (2)
> prior police contact, and (3) a police video.
>
> III. Petitioner was deprived of his Fifth and Fourteenth
> Amendment rights of due process when the trial court
> denied his motion for a directed verdict.
>
> IV.  Petitioner was deprived of his Fifth and Fourteenth
> Amendment rights of due process when the court
> denied a motion by appellate counsel for funds to
> retain a DNA/serological expert.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this

court's habeas corpus review of state court decisions, and states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with

5

respect to any claim that was adjudicated on the merits in State court
proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented at the State court proceedings.

*28* U.S.C. § 2254(d); *Harpster v. State of Ohio*, 128 F.3d 322, 326 (6th Cir. 1997).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

### III. DISCUSSION

### A. Claim # 1: Consolidation of Trials.

In his first claim, Petitioner argues that the trial court erroneously granted the prosecution's motion to consolidate his trial with that of co-defendant Witcher. Petitioner contends that because he and Witcher had antagonistic defenses,

6

consolidating the trials prejudiced his substantial rights.  Respondent contends that this claim lacks merit.

The Supreme Court has suggested that the failure to sever trials can rise to the level of a constitutional violation when essential exculpatory evidence that would be available to a defendant tried alone is unavailable in a joint trial.  *Hutchinson v. Bell*, 303 F.3d 720, 731-732 (6th Cir. 2002).  As a general rule, joint trials are favored.  *United States v. Dempsey*, 733 F.2d 392, 398 (6th Cir. 1984).  Thus, a petitioner, seeking habeas relief on the basis of a trial court's failure to sever his trial from that of his co-defendants, bears a very heavy burden.  *United States v. Horton*, 847 F.2d 313, 316 (6th Cir. 1988).  A habeas court cannot grant relief unless a petitioner establishes that the failure to grant a severance rendered his trial fundamentally unfair.  *Jenner v. Class*, 79 F.3d 736, 741 (8th Cir. 1996).  Here, the Michigan Court of Appeals did not unreasonably apply that standard to the facts of the case.  It stated in pertinent part:

> Fitzpatrick first argues that the trial court abused its discretion in granting the prosecution's motion to consolidate defendants' trials because he and Witcher had antagonistic defenses, prejudicing his substantial rights. Fitzpatrick asserts that because each argues at trial that he did not fire a gun from the van, the other defendant was necessarily implicated as the shooter, and thus, this "is a classic case of one defendant being pitted against the other."  We disagree.
>
> A trial court's decision to sever or join a defendant's trial is reviewed for an abuse of discretion.  *People v. Hana*, 447 Mich. 344, 346; 524 NW2d 682 (1994); MCL 768.5; MCR 6.121(A).  Severance is required only when a defendant demonstrates that his substantial rights will be prejudiced by joinder and severance is the only means of rectifying the prejudice.  *Hana*, *supra* at 346; MCR 6.121(C).  A defendant must present the court with an affidavit or an offer of proof demonstrating his substantial rights will be prejudiced.  *Hana*, *supra* at 346.  Further, there is a strong policy in favor of joint trials.  *Id.* at 342.

7

In *Hana*, our Supreme Court addressed the issue of prejudice in the context of antagonistic defenses, and rejected a per se severance rule in antagonistic defense cases. *Id.* at 348. The *Hana* Court held:

Inconsistency of defenses is not enough to mandate severance; rather, the defenses must be "mutually exclusive" or "irreconcilable." Moreover, "[i]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice." The "tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." [*Id.* at 349; citations and quotations omitted.]

In this case, both defendants denied being a shooter. However, contrary to Fitzpatrick's assertion, this did not automatically implicate the other defendant as the shooter because there was a third person in the van, Ernest Brooks, and the defense alluded to a fourth. Therefore, defendants' defenses were not irreconcilable. Accordingly, Fitzpatrick's substantial rights were not prejudiced and the trial court did not abuse its discretion in granting plaintiff's motion for consolidation.

*Fitzpatrick*, 2003 WL 21977224, at *1-2.

The Michigan Court of Appeals' decision did not result in an objectively unreasonable application of the standard established by Supreme Court law. The evidence in this case clearly demonstrated that the defendants acted in concert in all aspects from the armed robbery through the shootout with the police officers. Therefore, the evidence against the two defendants was exactly the same with the exception of the medical testimony relating to their individual shooting injuries. At the hearing on the motion to consolidate, neither of the defendants was able to demonstrate any serious antagonistic defenses.

The evidence established that Petitioner and Witcher jointly participated in a sequence of crimes, culminating in an attempt to murder three police officers. There was no substantial showing of a difference in the liability of the two defendants and neither defendant made an offer of proof as to potential testimony which would

8

substantially prejudice the rights of each.  There was no justifiable reason presented to

try the two men separately.  Based upon all of these factors, it was not unreasonable for

the Michigan Court of Appeals to conclude that Petitioner's substantial rights were not

prejudiced and that the trial court did not abuse its discretion in granting the motion for

joint trials.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### B.  Claim # 2: Improper Admission of Evidence.

Petitioner next claims that his trial was rendered unfair (1) by the introduction of

evidence concerning the robbery, (2) by other interactions with the police, and (3) by the

video camera that was attached to Officer Rivera's car.  The Michigan Court of Appeals

rejected Petitioner's claim on the merits without unreasonably applying clearly

established Supreme Court law.  That court stated:

> Fitzpatrick first argues that Detective Tim Lepper's statement, "The first
> time I took photographs of suspects he had a street name for one of the
> people he let use the van," allowed the jury to know that Fitzpatrick had
> had prior contact with the police.  Even if this were true, Fitzpatrick did not
> object at trial and he cites no law to support his claim of error.  Therefore,
> Fitzpatrick has waived review of this issue.  *Mudge v. Macomb Co*, 458
> Mich. 98, 105; 580 NW2d 845 (1998).  Regardless, there was no error
> because when read in context Detective Lepper's testimony did not allude
> to prior police contact.
>
> Fitzpatrick also argues that the trial court erred in admitting evidence of
> the robbery that occurred in a nearby garage minutes before the shooting
> incident with police because this was not res gestae evidence.  Again, we
> disagree.
>
> In *People v. Sholl*, 453 Mich. 730, 740; 556 NW2d 851 (1996), the
> defendant, who was charged with third-degree criminal sexual conduct,
> objected to the presentation of evidence that he had used marijuana on
> the night of the alleged misconduct.  In upholding the evidence's
> admission, the Court stated that "it is essential that prosecutors and
> defendants be able to give the jury an intelligible presentation of the full
> context in which the disputed events took place."  *Id.* at 741.  The Court

9

reaffirmed this principle by quoting with approval the following passages
from *People v. Delgado*, 404 Mich. 76, 83; 272 NW2d 395 (1978):

> It is the nature of things that an event often does not occur
> singly and independently, isolated from all others, but,
> instead, is connected with some antecedent event from
> which the fact or event in question follows as an effect from
> a cause.  When such is the case and the antecedent event
> incidentally involved the commission of another crime, the
> principle that the jury is entitled to hear the "complete story"
> ordinarily supports the admission of such evidence.

* * *

> In this case, there was strong evidence implicating Fitzpatrick in the
> robbery which occurred just prior to the shooting.  Most damaging was the
> distinctive devil's mask that one of the robbers wore and was found in the
> black van.  A saliva sample taken from the mask around the mouth area
> identified Fitzpatrick as its wearer.  A neighbor heard gunshots and saw
> two men running to the black van parked next to his house.  Within
> minutes, the police arrived and the shooting began.  There was significant
> evidence that the two incidents were connected, and the robbery
> explained the circumstances of the shootings.  Specifically, it explained
> why Fitzpatrick was in the area, why the police responded to the area, and
> the motive for shooting at the police, seemingly without provocation.
> Therefore, we find that the trial court did not abuse its discretion in
> admitting evidence of the robbery.

> Lastly, Fitzpatrick argues that the police videotape from Officer Rivera's
> patrol car, the portion on which Sergeant Hultink could be heard yelling in
> pain after the van fled the scene, was inadmissible under MRE 403
> because it only served to inflame the passion of the jury and evoke
> sympathy.  However, Fitzpatrick failed to provide this Court with the
> videotape to review.  Nevertheless, even if the objected to portion of the
> videotape was overly prejudicial, we find any error to be harmless, and
> thus, reversal is not required, given the overwhelming amount of evidence
> of Fitzpatrick's involvement in the shooting.  *People v. Smith*, 243
> Mich.App. 657, 680; 625 NW2d 46 (2000).

*Fitzpatrick*, 2003 WL 21977224, at *2-3.

An issue concerning the admissibility of evidence or error in state procedure

does not rise to a level of constitutional magnitude unless it can be viewed as so

egregious that petitioner was denied a fundamentally fair trial. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 125 S.Ct. 126 (2004). To determine whether the admission or inadmissibility of evidence has denied a defendant's fundamental due process rights, the court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir. 1994) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 297, 302 (1973)).

To the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas relief may be granted. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). A question concerning a perceived error of state law serves as a basis for habeas corpus relief only when the petitioner is denied fundamental fairness in the trial process. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The rulings by a state's highest court with respect to state law are binding on the federal courts. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Furthermore, the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, *supra* at 68. The federal courts are bound by decisions of an intermediate state appellate court unless convinced that the highest state court would decide the issue differently. *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988).

The Michigan Court of Appeals' decision was reasonable. Regarding the robbery, the jury heard a detailed description by witnesses that three men in masks, carrying two assault rifles and a distinctive semi-automatic pistol, forced their way into an illegal high-stakes gambling operation, fired at least two shots and stole a large

quantity of money, all occurring less than ten minutes before the shoot-out with the police officers.  That robbery was a half block away from where the officers were shot.

The physical evidence also included the weapons, ski masks--including an extremely distinctive red devil face Halloween mask, and large sums of cash strewn about the van in which the defendants had been hiding, as well as DNA extracted from inside the face mask found in the van.  This "overwhelming ... evidence," *Smith*, 243 Mich.App. at 680, convincingly demonstrated that it was Petitioner and his partners who robbed the card game moments before they tried to kill the police officers.

That evidence was inseparable from the evidence of the crimes charged.  It explained why the police officers went to the location where the crime occurred.  It showed why Petitioner and his partners were in the location where they were at the time of this crime, and explained why Petitioner and his partners were heavily armed and hiding in the van a mere twenty feet behind the officers.  The same evidence revealed Petitioner's motive for shooting at the police officers and the fact that they had fired shots during the robbery.

Therefore, the challenged evidence is relevant to numerous major issues in the trial. As relevant evidence, it was admissible absent a showing of undue prejudice under M.R.E. 402.  While there might have been some element of prejudice to Petitioner by the introduction of that evidence, the probative value clearly outweighed any prejudicial impact upon Petitioner.  The judge was correct in allowing its admission, and the Michigan Court of Appeals' decision did not unreasonably decide the claim against Petitioner.

12

Petitioner also complains of the prejudicial effect of allowing the jury to hear that portion of the videotape which showed the immediate aftermath of the shooting, moments after the Petitioner and his partner got away from the scene of the shootout with the police officers.  In that portion of the videotape Officer Hultink is heard screaming in pain and the other officers trying to comfort him.

The trial court found that "aftermath" evidence to be part of the *res gestae* of the crime scene.  The cries of the wounded officer in the aftermath was certainly of no greater prejudicial effect than the officer's cries in the first five or six seconds of the shootout itself when he was hit. The recorded evidence also must be viewed in light of the fact that the jury observed Officer Hultink, permanently crippled, enter the courtroom and walk to the witness box with the aid of "Kenny Sticks," and heard his testimony that he suffers extreme pain and will for the remainder of his life as a result of the gunshot wound which he sustained.

Petitioner can cite no Supreme Court case, let alone demonstrate the existence of clearly established Supreme Court law, that supports his claim that the introduction of this highly relevant evidence violated his constitutional rights.  Against that backdrop, Petitioner is not entitled to habeas relief on his claims regarding the admission of the evidence involving the robbery, prior contact with the police, and the videotape of the crime scene.

## C.  Claim # 3: Sufficiency of Evidence.

Next, Petitioner claims that the evidence presented at this trial was constitutionally insufficient to support the jury's verdict.  The Michigan Court of Appeals rejected this claim, and this court agrees.

13

A claim that the evidence was insufficient to convict a petitioner is cognizable under 28 U.S.C. § 2254.  Because the Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt," *Fiore v. White*, 531 U.S. 225, 228-29 (2001), "a state-law question regarding the elements of the crime predicates the enforcement of [petitioner's] federal constitutional right."  *Richey v. Mitchell*, 395 F.3d 660, 672 (6th Cir. 2005).

Sufficient evidence supports a conviction if, after viewing the evidence (and all inferences to be drawn therefrom) in a light most favorable to the prosecution, the court can conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *cert. denied*, 540 U.S. 1148 (2004).  This standard of review obviously does not permit the federal court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts.  *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *McKenzie, supra* at 727.  This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime and not to the state's burden to prove the absence of an affirmative defense; however, if the state has made the absence of a defense an element of the crime, sufficiency of evidence on the issue will then be relevant.  *Allen v. Redman*, 858 F.2d 1194, 1196-98 (6th Cir. 1988).  Circumstantial evidence may support a conviction and such evidence need not remove every reasonable hypothesis except

14

that of guilt.  *See Clifford v. Chandler*, 333 F.3d 724, 728 (6th Cir. 2003), *cert. denied*,

124 S.Ct. 1601 (2004); *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995).

      The last state court to issue a reasoned opinion rejecting this claim, the Michigan

Court of Appeals, held in pertinent part:

> Next, Fitzpatrick asserts that the trial court erred in denying his motion for
> directed verdict.  When reviewing a trial court's decision on a motion for a
> directed verdict, this Court reviews the record de novo to determine
> whether the evidence presented by the prosecutor, viewed in the light
> most favorable to the prosecution, could persuade a rational trier of fact
> that the essential elements of the crime charged were proved beyond a
> reasonable doubt.  *People v. Aldrich*, 246 Mich.App 101, 122; 631 NW2d
> 67 (2001).  Circumstantial evidence and reasonable inferences drawn
> from it may be sufficient to prove the elements of the crime.  *People v.
> Schultz*, 246 Mich.App 695, 702; 635 NW2d 491 (2001).  The court may
> not determine the weight of the evidence or the credibility of the
> witnesses, regardless of how inconsistent or vague the testimony was.
> *People v. Mehall*, 454 Mich. 1, 6; 557 NW2d 110 (1997).
>
> To prove the crime of assault with intent to murder, the prosecutor must
> establish: (1) an assault, (2) with an actual intent to kill, (3) which, if
> successful, would make the killing murder.  The intent to kill may be
> proven by inference from any facts in evidence.  *People v. Hoffman*, 225
> Mich.App 103, 111; 570 NW2d 146 (1997).  The elements of felony
> firearm are: (1) the possession of a firearm (2) during the commission of,
> or the attempt to commit, a felony.  *People v. Avant*, 235 Mich.App 499,
> 505; 597 NW2d 864 (1999).
>
> Here, the evidence showed that defendant Witcher was in the driver's
> seat, as established by the trajectory of the bullet which hit his leg and his
> blood that was found on the driver's seat, while the rifles were found on
> the floor between the first and second bench seats.  Officer Rivera stated
> that he fired at the front portion of the van and testified that based on the
> forensic evidence, he probably shot Witcher.  Viewing this evidence in the
> light most favorable to the prosecution, one could infer that Witcher
> remained in the driver's seat throughout the shoot-out.
>
> The evidence also indicated that the majority of the shots were fired from
> the middle portion of the van where the rifles were found.  Because the
> police officers were initially standing very close together when the shooting
> began, it can be inferred that the shooter was aiming at all three officers.

15

Also, the evidence established that one shooter was tracking Sergeant Madsen as he took cover behind Officer Rivera's car.

Fitzpatrick sustained a bullet wound to his foot, where the bullet entered the sole of his foot and exited through the top; therefore, Fitzpatrick's foot must have been perpendicular to the to (sic) fired bullet in order to sustain injury. Sergeants Madsen and Hultink testified that they returned fire, aiming at the middle portion of the van. Further, one of Fitzpatrick's bullet wounds was to the outer side of his left leg. Because the passenger side of the van was facing the officers, if Fitzpatrick had been seated facing forward, his outer right leg would be exposed. If he was laying on his stomach, his left outer leg would have been against the back seat. A reasonable inference can be made that Fitzpatrick was sitting on the second bench seat, with his legs parallel to the floor, facing the officers at the time of the shooting.

Moreover, the devil's mask with Fitzpatrick's DNA on it was found in the middle of the first bench seat and Brooks and an alcohol bottle with Brooks' blood on it was found between the second and third bench seats. Brooks' blood was also found on the seat back and the back of the lower ruffle area of the second bench seat, and on the right rear passenger wall. Based on this evidence, one could logically infer that Brooks was shot at the back of the van.

Fitzpatrick notes, however, that the van fled the scene at a high rate of speed and traveled a short distance before it was found abandoned. Therefore, items or people could have shifted position from where they were at the scene to the position in which they were found. While this is certainly a possibility, the evidence must be viewed in the light most favorable to the prosecution, with all inferences also being drawn in its favor. Doing so, we conclude that a reasonable jury could find that the elements of assault with intent to murder and felony-firearm were proven beyond a reasonable doubt, and thus, the trial court did not err in denying Fitzpatrick's motion for directed verdict.

*Fitzpatrick*, 2003 WL 21977224, at *3-4.

The Michigan Court of Appeals' decision did not involve an objectively unreasonable application of clearly established Supreme Court law. The testimony in this case is consistent from all of the witnesses; the first shots fired at the officers came from the center portion of the van and blew the middle window out of the side of the

16

van.  It was proven by DNA evidence that Witcher was seated in the driver's seat.  A

Halloween mask – obviously Petitioner's mask – was found in the middle of the van.

Additionally, there were two assault rifles found in the middle of the van.  Furthermore, it

was shown medically that Petitioner received bullet wounds in his feet; one explanation

being that Petitioner braced his foot against the wall of the van while he was shooting at

the officers and the officers' bullets that entered the van wall penetrated his foot.

The evidence constitutes overwhelming proof of the elements necessary for a

conviction of an assault with an intent to kill.  The trial court did not err in denying

Petitioner's motion for a directed verdict.  Petitioner is not entitled for habeas relief on

this claim.

### D.  Claim # 4:  DNA Expert.

Finally, Petitioner claims that he had a right to the appointment of an expert

witness on DNA analysis to consult with during his appeal of right.  This claim is without

merit.  The Michigan Court of Appeals stated:

> A trial court's decision regarding whether to appoint an expert witness for
> an indigent defendant is reviewed for an abuse of discretion.  *People v.
> Tanner*, 255 Mich.App 369, 396-397; 600 NW2d 746 (2003).  A defendant
> is not automatically entitled to the appointment of a DNA expert merely
> because such evidence was offered against the defendant at trial.  *People
> v. Leonard*, 224 Mich.App 569, 582-583; 569 NW2d 663 (1997).  Affirming
> the legal principles outlined in *Leonard*, the *Tanner* Court stated:
>
>> [A] defendant must demonstrate something more than a mere
>> possibility of assistance from a requested expert; due process does
>> not require the government automatically to provide indigent
>> defendants with expert assistance upon demand.  Rather, a fair
>> reading of these precedents is that a defendant must show the trial
>> court that there exists a reasonable probability both that an expert
>> would be of assistance to the defense and that denial of expert
>> assistance would result in a fundamentally unfair trial. [*Id.* at 397-
>> 398, internal quotations and citations omitted.]

17

"In other words, to be entitled to an appointed expert, a defendant must show a nexus between the facts of the case and the need for an expert." *Id.* at 398, quoting *Leonard*, *supra* at 582.  However, reversal is only required if the defendant was prejudiced and received a fundamentally unfair trial as a result of not having the expert's assistance.  *Id.* at 398.

Whether a defendant is entitled to the appointment of an expert on appeal, or under what circumstances, has not been addressed in Michigan. However, we believe that the legal principles outlined in *Leonard*, *supra*, are equally applicable at this stage of the litigation; that is, this Court must first determine whether there exists a reasonable probability that the expert would be of assistance to the defendant on appeal and second, whether lack of this assistance would result in foreclosing an appealable issue, rendering the defendant unable to fully exercise his appellate rights.

Fitzpatrick wanted a DNA expert to review the testing procedures of the prosecution's DNA experts who testified at trial.  Yet, Fitzpatrick could cite no potential error with the protocol, only stating, "Without oversight by a defense expert *it might well be* that the prosecutor's expert grossly mischaracterized and overstated the serological evidence implicating Defendant in the offense."  (emphasis added).  Such reasoning is insufficient to establish the need for an expert to be appointed.  A defendant must demonstrate something more than a mere possibility of assistance from a requested expert in order to demonstrate that the principles of due process have been violated.  *Tanner*, *supra* at 397. Accordingly, we find that the trial court did not abuse its discretion in denying appellate counsel's motion for the appointment of a DNA expert.

*Fitzpatrick*, 2003 WL 21977224, at *5.

The United States Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) held that the Due Process Clause of the Fourteenth Amendment obligates the states to provide an indigent defendant with access to psychiatric examination and assistance when the defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial.  The Supreme Court, however, has never extended the state's obligation to provide expert assistance beyond psychiatric examination; nor has it ever held that a convicted defendant is entitled to the appointment of an expert witness to assist with a direct appeal of right.

18

Thus, the Michigan Court of Appeals' determination that Petitioner was not entitled to the appointment of an expert on DNA, is not contrary to, nor and unreasonable application of the United States Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that the petition for writ of habeas corpus [Dkt. # 1] is DENIED.

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 26, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 26, 2006, by electronic and/or ordinary mail.

 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522